# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

**SHIRLEY A. ARCHER,**

      **Plaintiff,**

-vs-                                                   **Case No. 6:03-cv-1235-Orl-18KRS**

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This matter came before the Court for consideration without oral argument on the complaint filed by Shirley A. Archer seeking review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for social security disability benefits. Doc. No. 1. The Commissioner answered the complaint and filed a certified copy of the transcript of the proceedings before the Social Security Administration ("SSA"). Doc. Nos. 13, 14.

**I.    PROCEDURAL HISTORY.**

The Commissioner previously determined that Archer was disabled from May 21, 1996, through July 22, 1997, based upon back injuries and resulting pain, depression, and hypertension. The Commissioner concluded that, on and after July 22, 1997, Archer's medical condition had improved such that she could perform a full range of sedentary work. Thus, her disability ended as of July 22, 1997. TR. 64-72.

On August 25, 1999, Archer again applied for disability benefits under the Supplemental Security for the Aged, Blind and Disabled Program ("SSI"), 42 U.S.C. § 1381, *et seq*., and the Federal Old Age, Survivors and Disability Insurance Programs ("OASDI"), 42 U.S.C. § 1382 *et seq*., alleging a disability onset date of October 1, 1997.  TR. 95-97, 277-78.  The SSA denied Archer's applications both initially and on reconsideration.  TR. 81-83, 86-88, 279-80, 283-84.  Then, Archer made a timely request for a hearing.  TR. 89-90.

An Administrative Law Judge ("ALJ") held a hearing on January 18, 2001.  TR. 40.  Archer, who was accompanied by her attorney, testified at the hearing.  TR. 38-59.

The ALJ found that Archer had not engaged in substantial gainful activity since October 1, 1997, the alleged onset date of her disability.  TR. 25.  The ALJ concluded that the medical evidence showed Archer had lumbar degenerative disc disease and obesity, both of which were severe impairments.  *Id.*  He found that her complaints of depression did not rise to the level of a severe impairment.  TR. 24.  The ALJ concluded that Archer's impairments did not meet any of the listed impairments in the SSA regulations.  TR. 25.

The ALJ found that Archer had the residual functional capacity to perform the exertional and nonexertional requirements of light work.  TR. 25.  The ALJ's reasoning relied upon Archer's activities of daily living, essentially normal results from medical examinations except for reduced range of motion in the lumbar spine and difficulty stooping, and lack of any treatment for mental impairments.  TR. 23-24.  In reaching this conclusion, the ALJ determined that Archer's testimony about the functional limitations she experienced was exaggerated as to pain and limitations and not supported by medical evidence.  TR. 24.

The ALJ found that Archer could not return to her past work. TR. 25. Using the Medical-Vocational Guidelines (the "grids"), 20 C.F.R. Pt. 404, Subpt P, App. 2, the ALJ concluded that there was work Archer could perform and, therefore, that she was not disabled. TR. 25.

Archer requested review of the ALJ's decision. TR. 14-18. Archer submitted to the Appeals Council records from the Orlando Foot and Ankle Clinic dated November 14, 2001, through October 24, 2002, and medical records from Pain Management Center of West Orange dated June 2, 2002, through October 18, 2002. TR. 7, 288-333. On June 26, 2003, the Appeals Council found no basis for changing the ALJ's decision. TR. 8-11. In doing so, the Appeals Council discussed the new evidence Archer submitted. The Appeals Council stated that because the medical evidence discussed treatment received by Archer after the ALJ's decision was issued, it did not affect the decision whether Archer was disabled on or before the date of the ALJ's decision. TR. 9. Archer timely sought review of this decision by the United States District Court. Doc. No. 1.[1]

On November 19, 2003, the Commissioner filed an unopposed motion to remand this case back to the SSA because a tape of the hearing before the ALJ had been lost. Doc. No. 10. The Honorable G. Kendall Sharp, the presiding district judge, granted this motion on November 20, 2003. Doc. No. 10. Subsequently, on July 20, 2004, the Commissioner moved to reopen the case because the tape of Archer's ALJ hearing had been recovered, which motion the Court granted on July 21, 2004. Doc. Nos. 12, 15.

---

[1] Archer has advised the Court that, in response to subsequent disability applications, the Commissioner determined that Archer was disabled as of October 18, 2002. Doc. No. 22. Thus, the only time frame at issue in the present case is the period July 22, 1997, through October 17, 2002.

-3-

**II.    JURISDICTION.**

The Commissioner issued a final decision after a hearing with respect to Archer's application for disability benefits under OASDI and SSI. Therefore, the Court has jurisdiction of this matter under 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

**III.   STATEMENT OF FACTS.**

A.    <u>Archer's Testimony</u>.

Archer was born on August 20, 1955. TR. 41. She is five feet and eight and one-half inches tall and she weighs 270 pounds. TR. 42. She has two children who live with her, one six years old and the other two years old. TR. 42. The highest level of education she achieved was the eleventh grade, and she received some vocational training as a certified nursing assistant. TR. 42.

Archer previously worked as a Certified Nursing Assistant and in the shipping and receiving department of a laboratory. TR. 42, 107.

Archer has pain in her neck that spasms "like electrical shock" and forces her to make a jerking motion. TR. 44. She experiences numbness in her arms associated with pain, which is so severe that she cannot move her arms. TR. 44. Arthritis causes pain in all of her joints. TR. 44-45. Her back aches with pain along with spasms. TR. 44. In her hips, she feels numbness and throbbing pain down to her feet. TR. 44. When her legs become numb she cannot move them. TR. 44. Pain and numbness in her arms, hands, and fingers make it difficult for her to lift things. TR. 45, 50. Archer also has problems with high blood pressure, which she treated with medication, and asthma. TR. 44-45. She cannot lift her arms over her head. TR. 51. She takes a variety of pain medication, including using a three-day time release morphine patch. TR. 57.

In an average day, Archer awakens at about 2:00 a.m. to take her medication, and lies in bed until she is able to fall asleep. TR. 46. Then she gets up at 7:00 a.m. Her morning routine involves making coffee and breakfast and waking her grandson up to go to school. TR. 46. Usually, her grandson's mother comes to Archer's house to get him dressed and take him to school. TR. 46. Archer watches television for approximately two hours each day. TR. 53. She has difficulty concentrating. TR. 57. She spends the rest of the day sitting or lying in bed. TR. 46-47. She needs to keep her legs elevated due to edema. TR. 56.

Archer lives in an apartment. TR. 46. Her daughters take care of her usual household chores. TR. 46. She can drive a car if she is not under the influence of her medication. TR. 47. Medication makes her drowsy and forgetful. TR. 123. She does not have any hobbies. TR. 47. Archer smokes tobacco, but does not use alcohol. TR. 47.

Archer can walk about one block and can stand for approximately ten minutes at a time. TR. 48. She can sit in one position for approximately thirty minutes at a time. TR. 48. She is unable to lift and hold objects. TR. 48. A gallon of milk is too heavy for Archer to carry. TR. 48. From a sitting position, if she dropped a pen on the floor, she could not bend down to pick it up. TR. 50. She cannot squat. TR. 50. She has problems with the use of her hands and arms in driving, bathing, and dressing. Her son and grandson help her get dressed. TR. 49. Archer could pick up buttons and put them in a box, but she does not believe she could complete work involving similar movements for eight hours per day at, for example, an assembly-line job, because that would require "moving [her] arm and stuff about too much." TR. 51. She goes with her daughters to shop for groceries and walks down the aisle, using a shopping cart to lean on, telling them what to pick up. TR. 54. However, Archer gets tired and sits at the front of the grocery store before they are finished shopping. TR. 54.

B.  Medical Records.

Archer's medical problems began on October 20, 1995, when she suffered a strained back while trying to move a patient into a bed in her job as a nurse's assistant. TR. 235. From January 29 through April 12, 1996, Archer was treated by Paul J. Maluso, M.D. TR. 162-71. Archer complained of low back and right hip pain, for which she was taking Motrin, Lortab, and Soma.[2] TR. 171. Dr. Maluso noted that Archer had good range of motion of the back, tenderness through the right paraspinal area, and some pain over the right greater trochanteric area.[3] TR. 171. Dr. Maluso's impression was that Archer suffered from a lumbosacral sprain/strain with right radiculopathy.[4] TR. 171. He recommended an MRI scan of Archer's low back, and treatment with a TENS unit.[5] TR. 171. Dr. Maluso injected Archer's "trigger spot"[6] with a steroid and with Xylocaine.[7] TR. 171. Dr. Maluso restricted Archer to no heavy lifting over 30 to 35 pounds, no repetitive bending or twisting, and light duty. TR. 163-65, 171.

---

[2] Motrin is an over-the-counter pain relief medication. McNeil Consumer & Specialty Pharmaceuticals, *Motrin Family of Products* (2005), *at* http://www.motrin.com (last visited July 8, 2005). Lortab is a pain reliever that consists of a mixture of hydrocodone, a poppy-based narcotic, and acetaminophen. Cerner Multum, Inc., *Lortab*, DRUGS.COM (July 9, 2003), *at* http://www.drugs.com/lortab.html (last visited July 8, 2005) (hereinafter "Drugs.com"). Soma, also known as carisoprodol, is a muscle relaxant. *Id.* at http://soma.drugs.com (last visited July 8, 2005).

[3] Paraspinal means "adjacent to the spinal column." Merriam-Webster, Inc., *Paraspinal*, MERRIAM-WEBSTER'S MEDICAL DICTIONARY (2002), *available at* http://dictionary.reference.com/search?q=paraspinal (last visited July 8, 2005) (hereinafter "Merriam-Webster's"). The trochanteric area basically refers to the hip. STEDMAN'S MEDICAL DICTIONARY 1857 (26th ed. 1995) (hereinafter "Stedman's").

[4] The term lumbosacral refers to the area of the back located near the lumbar spine, *i.e.*, the lower back, and the sacrum, which is the part of the spine that forms part of the pelvis. Stedman's at 998, 1566. Radiculopathy refers to a disorder of the spinal nerve roots. Stedman's at 1484.

[5] A TENS unit is a device that, by issuing an electric pulse, blocks pain signals to the brain. *TENS Pain Therapy*, at http://www.healiohealth.com/tek9.asp (last visited July 8, 2005).

[6] A trigger spot is a location where a relatively small input turns on a relatively large output, *e.g.*, merely touching an area causes an inordinate amount of pain. Stedman's at 1853.

[7] Xylocaine is topical local anesthetic used to relieve pain. Drugs.com *at* http://www.drugs.com/cons/Xylocaine.html (last visited July 8, 2005).

A subsequent MRI revealed evidence of a small herniation at L4-5 centrally and a disc at L5-S1 with central and post-central left-sided protrusion.[8] TR. 170. Based on the MRI, Dr. Maluso's impressions were that Archer suffered from the following: (1) degenerative disc disease of the lumbar spine[9]; (2) small central posterior protrusion of disc material at L4-5, contacting displacement of the thecal sac without spinal stenosis[10]; (3) small central and slight left-sided posterior protrusion of disc material at L5-S1 contacting the thecal sac as well as bilateral S1 nerve roots causing some dorsal displacement on the left with spinal stenosis at this level; and (4) mild facet joint arthropathic changes.[11] TR. 169. Dr. Maluso recommended that Archer receive epidural blocks, but this treatment was ineffective. TR. 168.

A CT myelogram showed a defect at the L4-5 vertebrae of "generalized disc bulging with facet prominence producing central and lateral recess narrowing and narrowing of the L5 nerve root sleeves." TR. 167. There was no evidence of disc herniation. *Id.* Dr. Maluso concluded that Archer was not a surgical candidate. *Id.* Archer continued to complain of pain in her back and down her right leg. TR. 166.

In May 1996, Michael J. Broom, M.D., examined Archer and recommended surgery. He performed a laminectomy and partial medial facetectomy on May 21, 1996. After surgery, Archer

---

[8] The number-letter combinations, such as L4-5 and L5-S1, refer to specific vertebrae, or spinal bones. The protrusions describe the manner in which discs, or layers of cartilage between vertebrae, protrude from their ordinary position.

[9] Degenerative disc disease refers to a retrogressive pathologic change, or worsening, of the tissue that forms the discs, or layers of cartilage, between vertebrae. Stedman's at 450.

[10] The thecal sac is the tissue that forms a case around the disc. Stedman's at 1794. Stenosis refers to the narrowing of a blood vessel. *Id.* at 1673. Thus, the diagnosis in the text refers to a disc that is out of place and, as a result, is placing pressure on a blood vessel.

[11] Arthropathic refers to any disease affecting a joint. Stedman's at 150.

indicated that her back condition had improved. TR. 64.[12]  However, by November 1997, Archer again complained of occasional back, right hip and leg pain, aching feet, and pain along her spine extending to her neck. TR. 238.  Dr. Broom referred Archer to Justin Wasserman, M.D., for pain management. TR. 238.

From November 1997 through 1999, Archer visited Justin Wasserman, M.D., on a number of occasions. TR. 219-37.  On November 19, 1997, Dr. Wasserman performed a nerve conduction study on Archer, but readings were difficult to obtain due to Archer's obesity. TR. 237.  Dr. Wasserman opined that the results of the studies indicated possible nerve damage on the right lower extremity and possibly some axonal and demyelinating nerve damage resulting from old radiculopathy, although he found no evidence of acute radiculopathy. TR. 237.  His impression was chronic low back pain with chronic radiculopathy and possible nerve root irritation, chronic pain syndrome, secondary depression, and insomnia. TR. 235.  Dr. Wasserman treated Archer with medication, including Lodine, Zoloft, Elavil, Daypro, Neurotin, Zostrix, Norflex, Skelaxin, Oxycontin, Colace, and Senokot.[13]  TR. 226, 232-33.  The combination of medications helped ease Archer's pain when taken consistently. TR. 228, 231-32.  However, in a treatment note dated August 19, 1998, Dr. Wasserman observed that Archer's pain was exacerbated even with medication, noting that she was "[e]xquisitely tender in diffuse mid and upper low back regions." TR. 227.  He proposed a long-acting opioid[14] trial "to decrease her pain, increase her function, and increase her quality of life." *Id.*

---

[12] Dr. Broom's records from 1996 are not included in the transcript before the Court.

[13] Zostrix is a pain relief drug.  Norflex is a muscle relaxer.  Oxycontin is a narcotic pain relief drug.  Colace and Senokot are stool softeners.  Drugs.com, *at* http://www.drugs.com/cons/Zostrix.html, http://www.drugs.com/PDR/Norflex_Injection.html, http://www.drugs.com/oxycontin.html, http://www.drugs.com/PDR/Peri_Colace_Capsules_and_Syrup.html, http://www.drugs.com/PDR/Senokot_Tablets.html (last visited July 8, 2005).

[14] The term opioids refers to opiates and synthetic narcotics.  Stedman's at 1255.

On September 9, 1998, Dr. Wasserman noted that Oxycontin had greatly improved Archer's pain, but was causing her to itch. Therefore, he discontinued Oxycontin, and began her on MS Contin, a similar narcotic.[15] TR. 225. From October 1998 through February 1999, Archer reported that MS Contin "'works'" and that she felt much better. TR. 220, 223-24. After examination in February 1999, Dr. Wasserman determined that Archer's strength and reflexes in the lower extremities were good and that she had tenderness only in the mid low back, but the pain was not severe. TR. 220.

Beginning in May 1999, Archer visited Marc R. Gerber, M.D., on several occasions. TR. 206-12, 216-19. Dr. Gerber noted that Archer still had a "very diminished" range of motion, inability to do a deep squat, with diffuse low back tenderness and discomfort. MS Contin continued to help relieve pain. Dr. Gerber continued Archer's medication and prescribed a program of walking to strengthen her back. TR. 218-19. He opined that Archer could work at a job with light duty restrictions. TR. 217.

On June 16, 1999, Dr. Gerber again examined Archer. TR. 213-16. He diagnosed her with chronic low back pain, which was more severe on her right side, due to her 1997 surgery. TR. 215. Dr. Gerber performed an epidural block with fluoroscopy.[16] TR. 215. A nerve conduction study administered in August 1999 was essentially normal. TR. 212.

On October 12, 1999, Archer told Dr. Gerber that she had generalized right leg pain, some left leg pain, and hip discomfort mostly on the right side. MS Contin continued to control her pain. She also reported feeling depressed since she stopped taking Zoloft. Dr. Gerber restarted

---

[15] MS Contin is a narcotic analgesic, or pain reliever. Drugs.com, *at* http://www.drugs.com/cons/M_S_Contin.html (last visited June 21, 2005).

[16] Fluoroscopy refers to the process of observing the deep tissues of the body by x-ray by interposing a glass plate coated with fluorescent materials. Stedman's at 667.

Zoloft and referred Archer to a psychiatrist. TR. 209. Dr. Gerber noted that Archer's x-rays were normal. After examination, he observed that Archer had "mild decreased range of motion of both hips symmetrically with 120 degrees of flexion,[17] 0 degrees extension." TR. 209. Archer had a negative straight leg raising test on both legs,[18] and had no radicular pain in the sitting and supine positions. The range of motion in her back was limited to approximately 50 degrees flexion and 10 degrees extension. *Id.* Dr. Gerber's impression was that Archer had mild degenerative changes in the hips bilaterally, continued low back and right leg pain, and depression. TR. 208.

On January 1, 2000, Archer visited Dr. Gerber for a follow-up examination. Dr. Gerber noted that Archer had a recurring problem of running out of MS Contin. He switched Archer to a Duragesic patch. After examination, Dr. Gerber noted the same pain, tenderness, and range of motion limitations that had existed at Archer's previous visit. TR. 207. Dr. Gerber injected Archer with Medrol, Xylocaine, and Marcaine, and gave her twenty tablets of Lortab.[19] TR. 206. He also increased her prescription of Zoloft based on her continued complaints of depression. TR. 207. He made no changed in her work status. TR. 206.

On March 13, 2000, Nitin Haté, M.D., examined Archer at the request of the SSA. TR. 239. Dr. Haté noted that Archer's toe and heel walking was partially accomplished and that her squatting was fifty percent accomplished. He noted that her ankle deep tendon reflexes were absent and that her range of motion was reduced in the thoracolumbar spine. TR. 240. Dr. Haté's

---

[17] Flexion refers to the act of flexing or bending. Stedman's 663.

[18] "The simple straight-leg raising test [SLR] is performed with the patient lying supine, with the backs of the knees flat on the examining table. The knee is held straight, and the foot of one leg is raised while the hip is slowly flexed. Flexion of the leg through a range of 60 to 90 degrees is considered to be normal. The test is positive when pain is reproduced down the posterior thigh below the knee between the angle of 30 to 70 degrees." ATTORNEYS' TEXTBOOK OF MEDICINE ¶ 15.34(1) (3d ed.1999).

[19] Medrol is a steroid. Marcaine is a local anesthetic. Drugs.com, *at* http://www.drugs.com/MTM/M/Medrol.html, http://www.drugs.com/cons/Marcaine.html (last visited July 8, 2005).

impression was that Archer was "very symptomatic with pain in the lumbar area with radicular symptoms on the right side in the right leg." TR. 241. Dr. Haté opined that "[t]here is a significant subjective element in the range of motion and pain perception." *Id.* He concluded that Archer may have some difficulty performing strenuous physical activities, particularly heavy lifting and repetitive bending and stooping. *Id.*

On March 14, 2000, Michael Harrell, Ph.D., evaluated Archer at the request of the SSA. TR. 244-46. After conducting a clinical interview, Dr. Harrell diagnosed Archer with mild secondary late-onset dysthymia with a Global Assessment of Function ("GAF") of 55.[20] TR. 245.

Michael Ham-Ying, M.D., examined Archer on May 22, 2000. TR. 262-68. Archer reported that she had back pain, which was controlled with either MS Contin or a Duragesic patch. Dr. Ham-Ying noted marked tenderness to palpation in the lower lumbar and sacral spine. His diagnoses were low back pain and obesity. TR. 268. He prescribed Duragesic. TR. 268.

Archer returned to Dr. Ham-Ying on June 15, 2000, complaining of blurred vision, nausea, dizziness, and hip pain with numbness. Dr. Ham-Ying also noted pedal edema. His diagnoses were hypertension, chronic back pain, and side effects from excessive Norvasc doses. TR. 267. Archer returned the next month complaining of swelling in her feet and ankles. Dr. Ham-Ying diagnosed edema, hypertension, and obesity. TR. 266. Dr. Ham-Ying continued to treat Archer through November 2000 for the same conditions. TR. 264-65.

---

[20] The Global Assessment of Functioning ("GAF") scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, unable to care for self, or serious suicidal act). *Diagnostic and Statistical Manual of Mental Disorders - Fourth Edition* 32 (4th ed. 1994) (hereinafter the "*DSM-IV*"). A score between 51 and 60 is defined as moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

The following evidence submitted for the first time to the Appeals Council describes Archer's condition after the ALJ rendered his decision. On October 31, 2001, E. Corry Maguire, D.P.M., examined Archer. TR. 293. Dr. Maguire assessed her with possible plantar fascitis,[21] which he treated with Lidocaine, Dexamethasone Phosphate, and Depo-Medrol.[22] TR. 293. Dr. Maguire administered similar treatments on several other occasions during November and December 2001 and January 2002. TR. 294-301. On March 18, 2002, Dr. Maguire performed a right endoscopic plantar fasciotomy.[23] TR. 303-04. The surgery appeared to alleviate Archer's heel pain. TR. 308. In August, 2002, however, Archer complained of pain in both legs, which Dr. Maguire opined was not related to her foot problems. TR. 312.

On June 20, 2002, Carlos Jassir, M.D., examined Archer for pain management consultation and treatment. TR. 315-31. Archer complained that, on a scale of zero to ten, her pain was often a ten and never less than a seven. TR. 315. She was five feet, eight and one-half inches tall and weighed 290 pounds. TR. 318. She walked with an antalgic gait. TR. 319. Upon examination, Dr. Jassir noted tenderness on palpation of the lumbar and sacral spine associated with paraspinal muscle spasms. TR. 319. Dr. Jassir formulated a number of impressions regarding Archer's pain. First, he found that her left shoulder pain was secondary to the following conditions: (1) supraspinatus tendonitis; (2) subacromial bursitis; (3) impingement syndrome; (4) degenerative joint disease; (5) osteoarthritis of gleno-humeral joint; (6) suprascapular tendonitis; and (7)

---

[21] Plantar fascitis refers to an inflammation or swelling of fibrous tissue on the sole of the foot. Stedman's at 628, 1375.

[22] Lidocaine, dexamethasone phosphate, and Depo-Medral are anti-inflammatory drugs. Drugs.com, *at* http://www.drugs.com/MTM/lidocaine_topical.html, http://www.drugs.com/cons/Depo_Medrol.html (last visited July 8, 2005).

[23] Fasciotomy is the removal of the fibrous tissue involved in fascitis. Stedman's at 633.

suprascapular nerve entrapment syndrome.[24] TR. 321. Dr. Jassir opined that her middle and low back pain was secondary to the following conditions: (1) degenerative disc disease; (2) lumbar facet arthropathy; (3) iliolumbar ligament irritation; and (4) inter-spinal ligament enthesopathy.[25] TR. 321. Finally, Dr. Jassir opined that her lower extremity pain was secondary to: (1) lumbar disc displacement; (2) lumbar facet arthropathy; and (3) possible sensory radiculopathy. TR. 321.

From August to November 2002, Dr. Jassir saw Archer for a number of follow-up appointments. TR. 324-31. He consistently noted her continuing pain, and continued her prescriptions for medications that Dr. Ham-Ying had prescribed. TR. 324-31. On October 18, 2002, an MRI identified a disc bulge at C3-4 and C-6, and a herniated disc at C5-6 with spondylosis. TR. 332-33.

C.  Reviewing Physicians' Opinions.

1.  *Physical Assessments.*

On October 1, 1999, a physician, whose name is illegible, completed a physical residual functional capacity assessment ("RFC")[26] based on a review of Archer's records. TR. 186-93.

---

[24] Nerve entrapment syndromes are compression neuropathies at specific sites in the limb. W.Y. Ip, *Nerve Entrapment Syndromes*, *at* http://www.hku.hk/ortho/ortho/newsletter/newsletter03/1.html (last visited July 8, 2005). The term suprascapular refers to the area above the shoulder blades. Stedman's at 1576.

[25] Enthesopathy refers to "[a] disease process occurring at the site of insertion of muscle tendons and ligaments into bones or joint capsules." Stedman's at 578.

[26] Residual functional capacity "is what an individual can still do despite his or her limitations." Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 61 Fed. Reg. 34474-01 (1996)("SSR 96-8p"). It takes into account "the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." *Id.* RFC assesses the individual's ability "to do sustained work activities in an ordinary work setting on a regular and continuing basis . . . . A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule. RFC does not represent the least an individual can do despite his or her limitations or restrictions, but the most." *Id.* It is used to determine whether the individual can return to past, relevant work or can do other work.

The physician concluded that Archer had the following limitations: (1) occasionally lift 20 pounds; (2) frequently lift ten pounds; (3) stand or walk for six hours in an eight-hour workday; (4) sit for six hours in an eight-hour workday. TR. 187. The physician further opined that Archer would occasionally be limited in her ability to stoop and crouch. TR. 188.

On March 29, 2000, a physician whose name is not legible completed a RFC assessment of Archer based solely on review of her medical records. TR. 256-63. The physician concluded that Archer had the following limitations: (1) occasionally lift 20 pounds; (2) frequently lift ten pounds; (3) stand or walk for six hours in an eight-hour workday; and (4) sit for six hours in an eight-hour workday. TR. 257. This physician concluded that Archer's symptoms were consistent with her physicians' medical findings. TR. 261.

        2.    *Mental Assessments*.

On October 9, 1999, Deborah L. Carter, Ph.D., completed a Psychiatric Review Technique Form based on review of Archer's records. TR. 194-202. Dr. Carter concluded that Archer had no severe impairments. TR. 195. Dr. Carter noted that Archer suffered from depression, and that Archer would seldom suffer deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner. TR. 201.

On March 24, 2000, Jeffrey L. Prickett, Psy.D., completed a Psychiatric Review Technique Form after reviewing Archer's records. TR. 247-55. Dr. Prickett found no evidence that Archer suffered from any psychological disorders, except for one notation that is not legible. TR. 253. Dr. Prickett concluded that Archer would be slightly limited in the activities of daily living, experience slight difficulties in maintaining social functioning, and seldom have deficiencies of concentration, persistence, or pace. TR. 254.

**IV.   STANDARD OF REVIEW**

To be entitled to Social Security disability benefits under SSI and OASDI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(C). The Act provides further that a claimant is not disabled if he or she is capable of performing his previous work. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). In a case seeking disability benefits under SSI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits. 42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982) (internal quotations omitted).

The court "'must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision.'" *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir.

1987) (quoting *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986)). Even if the court finds that the evidence weighs against the SSA's decision, the court must affirm if the decision is supported by substantial evidence. *See Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The court may not reweigh the evidence or substitute its own judgment, even if the court finds that the weight of the evidence is against the SSA's decision. *Id.* While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988).

**V.   ANALYSIS.**

Archer raises the following three issues: (1) the Appeals Council incorrectly determined that evidence submitted was not new and material; (2) the ALJ's reliance on the grids was inappropriate; and (3) the ALJ failed to consider all of the medical evidence and make sufficient findings in the record to support his decision to discredit Archer's subjective pain testimony. I address only the first issue because I find it to be dispositive.

Archer contends that the medical evidence developed after the ALJ rendered his decision, particularly the October 18, 2002, MRI showing that she had bulging and herniated discs, was new and material evidence that the Appeals Council should have required the ALJ to consider. The Commissioner responds that the Appeals Council correctly found the evidence was not material because it did not relate to the period on or before the date of the ALJ's decision. Neither the Appeals Council nor the Commissioner cite to substantial evidence in the record supporting the conclusion that the evidence presented to the Appeals Council did not relate to Archer's testimony that her pain caused her substantial functional limitations.

To succeed on a claim that a remand is required to consider new evidence, Archer must show the following:

> "(1) there is new, noncumulative evidence; (2) the evidence is 'material,' that is, relevant and probative so there is a reasonable possibility that it would change the administrative result; and (3) there is good cause for the failure to submit the evidence at the administrative level."

*Vega v. Comm'r of Soc. Sec.*, 265 F.3d 1214, 1218 (11th Cir. 2001) (quoting *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986)).  Because the October 18, 2002, MRI was conducted after the ALJ rendered his decision, the evidence is new and noncumulative and there is good cause to support Archer's failure to submit the evidence to the ALJ.  *See id.* at 1218-19 (holding that a plaintiff met the first and third requirements because the discovery of a herniated disc took place after an ALJ's decision).  Therefore, I address only the second factor in the analysis.

As recited above, Archer's complaints of pain primarily stem from spinal problems.  An x-ray and nerve conduction study performed in 1999 were essentially normal.  Yet, Archer continued to complain of pain, which complaints her treating physicians credited as shown by the variety of strong pain medication they prescribed to help her cope with the pain.  An MRI test taken on October 18, 2002, revealed that Archer had bulging and herniated discs.  It is impossible to determine from the present record when between the x-ray and nerve conduction tests performed in 1999 and the MRI performed in October 18, 2002 that the bulging and herniated discs developed.  Thus, had the ALJ known of the October 18, 2002 MRI test result, he may have

further developed the record of the treating and examining physicians to learn when these bulging and herniated discs likely developed.[27]

There is a reasonable possibility that the ALJ would have found the October 18, 2002 MRI to be material, and that it would have changed his decision. The ALJ found that Archer's testimony about the functional limitations arising from pain were not fully credible based upon the medical evidence. He reasoned as follows:

> The claimant testified that other than preparing breakfast and getting her grandson off to school she spends the majority of the day in bed and does not do anything. However, the medical evidence from treating and examining physicians, show that except for reduced range of motion in the lumbar spine and difficulty stooping, the claimant had normal range of motion in all other joints, and she had normal motor and sensory exam, normal grip and muscle strength with no muscle atrophy, and normal fine and gross motor skills. Nerve conduction studies were unremarkable with no indication for the cause of the claimant's subjective pain complaints.

TR. 23. Had the ALJ known that medical findings showed that bulging and herniated discs developed in Archer's spine sometime between 1999 and October 18, 2002, his conclusion that the medical evidence did not support her complaints of pain likely would have been different. *See* Doc. No. 22 ( attaching a subsequent disability determination finding that Archer was disabled as of October 18, 2002); *Vega*, 265 F.3d at 1219 (finding that evidence of a herniated disc discovered after an ALJ rendered a decision was "material because it contradicts the ALJ's findings and conclusions regarding the severity of Vega's spinal problems"). Therefore, remand of this case is necessary to allow the Commissioner to reconsider Archer's disability in light of the new and material evidence that Archer submitted to the Appeals Council.

---

[27] It appears that Archer's failure to develop the record earlier may have been due to lack of insurance or other funding. *See* TR. 268 (May 22, 2000 treatment note reflecting Archer's recent loss of insurance); TR. 326 (September 2002 treatment note reflecting that Archer's request for authorization to an MRI was denied).

## VI. RECOMMENDATION.

For the reasons stated above, I respectfully recommend that the decision of the SSA be **REVERSED** and that the case be **REMANDED** for further proceedings. I further recommend that the Court order the Clerk of Court to issue a judgment consistent with this Order and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on July 11, 2005.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy